# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>DOMINGO GONZALEZ, JR. | No. 3:09-cr-127 (SRU) |

## <u>ORDER</u>

On July 22, 2009, Gonzalez pleaded guilty (pursuant to a plea agreement) to an indictment charging him with two counts of bank robbery, in violation of 18 U.S.C. § 2113(a). *See* Indictment, Doc. No. 10; Min. Entry, Doc. No. 19; Plea Agreement, Doc. No. 75.  On the same day, Gonzalez waived indictment and pleaded guilty (pursuant to the same plea agreement) to an information charging him with possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).  *See* Information, Doc. No. 16; Min. Entry, Doc. No. 19; Plea Agreement, Doc. No. 75.  On May 28, 2010, I held a sentencing hearing and sentenced Gonzalez to 220 months' imprisonment and five years' supervised release.[1]  *See* Min. Entry, Doc. No. 77; Judgment, Doc. No. 78 (entered on June 1, 2010).  Gonzalez, who is 62 years old, is currently housed at the Federal Correctional Institution, Bennettsville ("FCI Bennettsville").  *See Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 22, 2021).  Gonzalez's scheduled release date is January 5, 2025.  *See id.*  Gonzalez has been incarcerated since his arrest on May 22, 2009.  *See* PSR, Doc. No. 151, at ¶ 2.  Gonzalez has thus served about two-thirds of his sentence (accounting for good-time credit).

---

[1]  More specifically, I sentenced Gonzalez to 160 months' imprisonment on both counts of the indictment, to run concurrently, and to the mandatory minimum of 60 months' imprisonment on count one of the information, to run consecutively to the counts of the indictment.  *See* Judgment, Doc. No. 78.  Similarly, I sentenced Gonzalez to 36 months' supervised release on both counts of the indictment and 60 months' supervised release on count one of the information, all to run concurrently.  *See id.*

On December 21, 2020, Gonzalez (through counsel) filed a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act. *See* Mot. for Sentence Reduction, Doc. No. 144.  Gonzalez contends that "extraordinary and compelling reasons" warrant reducing his sentence to either time served or to some shorter period of incarceration.  *See id.* at 1.  In particular, Gonzalez seeks relief based on "(a) the growing COVID-19 pandemic, which has made his sentence much more punitive than intended," "(b) Mr. Gonzalez's age and medical conditions, including obesity," "(c) his efforts at rehabilitation during more than 11 years of incarceration," and (d) the " 18 U.S.C. § 3553(a) factors as applied in his particular case."  Mem. of Law in Supp. Mot. for Sentence Reduction ("Gonzalez's Mem. of Law"), Doc. No. 144-1, at 1.  Gonzalez also filed relevant medical records.  *See* Mot. to Seal, Doc. No. 143; Gonzalez's Medical Records, Doc. No. 143-1.  On January 9, 2021, the government filed an opposition.  *See* Gov't Opp'n, Doc. No. 146.  The government concedes that "extraordinary and compelling reasons" warrant Gonzalez's release but nonetheless opposes Gonzalez's release based on the section 3553(a) sentencing factors.  *See id.* at 6.  In particular, the government focuses on the seriousness of this offense and the possibility that Gonzalez will recidivate.  *See id.* at 6–9.

For the following reasons, I **deny** Gonzalez's motion for relief and decline to alter his sentence.

## I.     Standard of Review

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A).  Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons.  It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few

inmates were granted compassionate release.  *See, e.g.*, U.S. Dep't o f Justice, Office of the

Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons'*

*Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf

("[W]e found that the existing BOP compassionate release program has been poorly managed

and implemented inconsistently, likely resulting in eligible inmates not being considered for

release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood,

*Second Looks & Second Chances*, 41 Cardozo L. Rev. 83, 105–06 (2019); William W. Berry

III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate*

*Release*, 68 Md. L. Rev. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates

annually were granted compassionate release).

Congress passed the FSA against that backdrop.  The FSA altered section 3582(c)(1)(A),

in part, to increase the use of compassionate release.  *See* 164 Cong. Rec. H10358 (daily ed. Dec.

20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of

Compassionate Release").  In particular, the FSA amended section 3582(c)(1)(A) to allow a

defendant him- or herself to bring a motion for compassionate release.  Section 3582(c) now

reads, in relevant part:

> (c) Modification of an imposed term of imprisonment.—The court may not modify
> a term of imprisonment once it has been imposed except that – (1) in any case –

>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon
>> motion of the defendant after the defendant has fully exhausted all
>> administrative rights to appeal a failure of the Bureau of Prisons to bring a
>> motion on the defendant's behalf or the lapse of 30 days from the receipt of
>> such a request by the warden of the defendant's facility, whichever is
>> earlier, may reduce the term of imprisonment (and may impose a term of
>> probation or supervised release with or without conditions that does not
>> exceed the unserved portion of the original term of imprisonment), after
>> considering the factors set forth in section 3553(a) to the extent that they
>> are applicable, if it finds that –

> (i)  extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Until recently, I (and many other district courts around the country) interpreted the "applicable policy statement[] issued by the Sentencing Commission" to be U.S.S.G. § 1B1.13.  *See, e.g.*, *United States v. Almontes*, 2020 WL 1812713, at *2 (D. Conn. Apr. 9, 2020).

However, in September 2020, the Second Circuit clarified that section 1B1.13 is *not applicable* to compassionate release motions brought by defendants themselves.  *See United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020).  Since the Second Circuit decided *Brooker*, several courts of appeals in other circuits have concurred that section 1B1.13 is not applicable to compassionate release motions brought by defendants.  *See United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1101 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  Because in this case Gonzalez himself made a motion for compassionate release, I may "consider the full slate of extraordinary and compelling reasons," and nothing in the "now-outdated version" of section 1B1.13 limits my discretion.  *Brooker*, 976 F.3d at 237.

In granting motions for reductions in sentence under section 3582(c)(1)(A) that are based on the threat posed by COVID-19, courts within this circuit and across the country have concluded that "extraordinary and compelling" reasons for release may exist when an incarcerated defendant suffers from health conditions or other infirmities that make him particularly susceptible to serious complications should he contract COVID-19.  *See, e.g.*, *United States v. Colvin*, 451 F. Supp. 3d 237, 241 (D. Conn. 2020).

Several courts have held that an inmate's obesity can help constitute "extraordinary and compelling reasons" warranting that inmate's release.  Indeed, those who are obese are at an

increased risk for severe illness from COVID-19. *People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Feb. 22, 2021). For that reason, some courts have released inmates based, in part, on that condition. *See, e.g.*, *United States v. Rivera*, 2020 WL 7188418, at *5 (D. Conn. Dec. 7, 2020) (releasing defendant with BMI of 32.6 based, in part, on his obesity); *United States v. Franco*, 2020 WL 4344834, at *2–3 (S.D.N.Y. June 24, 2020); *United States v. Rodriguez*, 476 F. Supp. 3d 1071, 1075–76 (S.D. Cal. 2020); *United States v. Delgado*, 457 F. Supp. 3d 85, 89–90 (D. Conn. 2020). On the other hand, many courts have also declined to grant an inmate's motion for compassionate release when the inmate suffered from obesity, especially when there was no indication that that obesity was not being handled adequately at the inmate's institution.[2]

Many courts also consider a defendant's age in determining whether "extraordinary and compelling reasons" warrant that defendant's release. It is now well-known that the risk of severe illness from COVID-19 increases with age. *See Older Adults*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Feb. 19, 2021). Some courts have released defendants based, in part, on their age—even when those defendants were in their fifties or sixties. *See, e.g.*, *United States v. Asher*, 467 F. Supp. 3d 1285, 1290–91 (N.D. Ga. 2020)

---

[2] *See, e.g.*, *United States v. Sanchez*, 2020 WL 3790546, at *3 (S.D.N.Y. July 7, 2020) (noting that although inmate's high BMI (38.2) was a risk factor, the BOP was managing inmate's condition well, which "weighs against a finding of extraordinary and compelling circumstances") (quoting *United States v. Foozailov*, 2020 WL 3268688, at *2 (S.D.N.Y. June 17, 2020)) (cleaned up); *United States v. Steele*, 2020 WL 4717912, at *3 (W.D. Va. Aug. 13, 2020) (denying compassionate release to inmate with BMI of 43.5 because inmate had not shown "a particularized risk of contracting the disease at his facility" and the section 3553(a) factors weighed against his release); *United States v. Lindo*, 2020 WL 5038766, at *1 (S.D.N.Y. Aug. 26, 2020) (noting both that Lindo did not suggest "that he is receiving inadequate treatment for" his medical conditions and that "if preexisting medical conditions such as obesity were the end of the compassionate-release inquiry, every inmate who suffers from a COVID-19 risk factor would be entitled to release, no matter the severity of his crime or the potential danger of his release to the community").

(releasing 54-year-old defendant based, in part, on age); *United States v. Al-Jumail*, 459 F. Supp. 3d 857, 862–63 (E.D. Mich. 2020) (60-year-old defendant); *United States v. Pena*, 459 F. Supp. 3d 544, 550 (S.D.N.Y. 2020) (same); *United States v. McCarthy*, 453 F. Supp. 3d 520, 526–27 (D. Conn. 2020) (65-year-old defendant).  Again, on the other hand, numerous courts have held that prisoners older than 60 had not established "extraordinary and compelling reasons" warranting their release.[3]

Courts also routinely focus on a defendant's rehabilitation as one (non-dispositive) factor contributing to "extraordinary and compelling reasons."  *See, e.g.*, *United States v. Rodriguez*, 2020 WL 5810161, at *4 (S.D.N.Y. Sept. 30, 2020) ("[W]hile rehabilitation alone is insufficient, it can interact with the present coronavirus pandemic to create an extraordinary and compelling reason for a sentence reduction.") (quoting *Brooker*, 976 F.3d at 238) (cleaned up); *United States v. Millan*, 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020); 28 U.S.C. § 994(t) (providing that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason").

The defendant bears the burden of proving that he is entitled to a sentence reduction.  *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020).  Courts "have broad discretion in deciding whether to grant or deny a motion for a sentence reduction."  *United States v. Jones*, 2020 WL 2782395, at *2 (D. Conn. May 29, 2020) (quoting *United States v. Tagliaferri*, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)) (cleaned up).  Indeed, section 3582(c)(1)(A) grants a district court permissive authority to reduce an inmate's sentence under

---

[3] *See, e.g.*, *United States v. Haney*, 454 F. Supp. 3d 316, 322–323 (S.D.N.Y. 2020) (denying release to 61-year-old defendant who was "in reasonably good health" because "if Haney's age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress").

certain conditions.  *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . may reduce the term of

imprisonment . . . .").  A court may not reduce a term of imprisonment without "considering the

factors set forth in section 3553(a) to the extent that they are applicable."  *Id.*; *see also United*

*States v. Torres*, 464 F. Supp. 3d 651, 658 (S.D.N.Y. 2020) (explaining that courts must consider

section 3553(a) factors before granting a sentence reduction pursuant to section 3582(c)(1)(A)).

## II.   Discussion

### A.   Background

On January 28, 2009, Gonzalez and two others committed an armed robbery at a Webster

Bank in Milford, Connecticut.  PSR, Doc. No. 151, at ¶ 6.  There were five employees at the

Webster Bank at the time of the armed robbery.  *See id.*  Gonzalez and his co-defendant,

Francisco Deida, entered the bank through the rear, main door.  *See id.* at ¶ 7.  Gonzalez was

wearing "a hooded sweatshirt, scarf, face mask with holes cut out for his eyes and nose, ski

glasses, and was carrying an umbrella, which he opened upon entering the bank."  *Id.*  Using

guns, Gonzalez and Deida ordered all the employees to a rear corner of the bank.  *See id.* at ¶ 8;

Plea Agreement, Doc. No. 75, at 9.  Gonzalez and Deida stole $84,259 in cash before fleeing in a

black SUV driven by another individual named Henry Crespo.  *See* PSR, Doc. No. 151, at ¶ 8.

Gonzalez was not apprehended that day.  Instead, Gonzalez robbed another bank just

over two months later.  On April 6, 2009, the same trio committed an armed robbery at a TD

Banknorth in Woodbridge, Connecticut.  *See id.* at ¶ 9.  On that day, Gonzalez

> entered the bank and was clad in a hooded rain jacket with the hood up, a balaclava
> style mask which covered his face from the bridge of his nose to his neck, dark
> sunglasses, gloves and carried an umbrella.  When he was asked to remove his hood
> and mask, he walked directly to the tellers['] counter and vaulted over it so that he
> could approach the two tellers there.  He then proceeded to take the cash from both
> of these tellers['] drawers.

*Id.* at ¶ 10.  Later, Gonzalez "escorted the head teller into the vault," where the teller "filled a black plastic trash bag" with $23,002.  *Id.*

The police were alerted to the TD Banknorth armed robbery by an extremely observant postal carrier who witnessed the robbery in progress.  *See id.* at ¶¶ 9, 11.  When the three offenders fled the TD Banknorth in Gonzalez's Cadillac (driven by Crespo), the police were still not at the scene, and so the postal carrier followed the Cadillac himself until the police located the vehicle.  *See id.* at ¶¶ 11–12.  Officers then attempted to stop the Cadillac, but Crespo would not stop the car, and so a high-speed chase ensued.  *See id.* at ¶ 11.  At one point, Crespo slowed down so that Gonzalez and Deida could jump out of the Cadillac.  *See id.*  Crespo then sped up again before himself ditching the car.  *See id.*  When a pursuing officer attempted to apprehend Crespo on foot, Crespo would not comply with orders; in fact, it appeared to the officer as though Crespo was preparing to use a handgun tucked into his waistband.  *See id.*  As a result, the pursuing officer "discharged five rounds at Crespo, who was not struck and continued to flee."  *Id.*  Crespo was apprehended later that day, but Gonzalez and Deida were not.  *See id.* at ¶ 12.

After an investigation involving DNA evidence, anonymous tips, and a confidential informant, law enforcement was able to arrest Gonzalez on May 22, 2009.  *See id.* at ¶¶ 13–15.  Deida was arrested shortly thereafter.  *See id.* at ¶ 15.

Unfortunately, robbery has been Gonzalez's career.  Before this case, Gonzalez had amassed at least 16 first-degree robbery convictions, many of which were armed.  *See id.* at ¶¶ 16; 46–74.  Based on those and other crimes, Gonzalez has served two significant carceral sentences before this one.  First, following a series of burglaries and robberies in early 1978, Gonzalez was sentenced to 9-to-18 years' imprisonment and was indeed imprisoned from 1978

and 1983.  *See id.* at ¶ 89.  Soon after his release, Gonzalez was back in prison for a longer time.

Following a series of robberies in early 1984, Gonzalez was sentenced to 35 years'

imprisonment.  Gonzalez was ultimately incarcerated from 1984 until he was paroled in 2002.

*See id.* at ¶ 91.

Although he grew up in a two-parent household, Gonzalez had a very difficult

upbringing.  Multiple of his siblings died at young ages because of motor vehicle accidents and

diseases.  *See id.* at ¶ 79.  Between 11 and 15, Gonzalez reports that his father drank heavily and

physically abused him and his siblings. *See id.* at ¶ 81.  During those years, Gonzalez began

using marijuana, hallucinogens, and pills.  *See id.* at ¶ 82.  Gonzalez was arrested for the first

time at age 14 (for stealing a car).  *See id.* at ¶ 83.  Gonzalez reported that "he was happy in a

sense, to have been arrested, as it got him away f[ro]m his family and from the physical abuse he

was subjected to by his father."  *Id.*

At age 15, Gonzalez began using heroin.  *See id.* at ¶ 84.  Sadly, Gonzalez's addiction to

heroin became a lifelong problem and a main driver of his criminal activity.  In his late teens,

Gonzalez spent time in juvenile facilities for several auto thefts and burglaries.  *See id.* at ¶¶ 85–

86.  Gonzalez again noted that he "thrived while in custody and juvenile placements" and that

"he did not see it as a 'bad' thing to be incarcerated, because of [] all the amenities available to

him there."  *Id.* at ¶ 85.  During one of his early incarcerations, Gonzalez was diagnosed with bi-

polar disorder.  *See id.* at ¶ 88.

Despite all that, Gonzalez has displayed promise.  For instance, Gonzalez obtained his

GED while incarcerated in 1980.  *See id.* at ¶ 90.  Gonzalez earned an associate's degree from a

community college in 1992.  *See id.* at ¶ 111.  And Gonzalez obtained a commercial driver's

license in 2002.  *See id.* at ¶ 92.  Further, Gonzalez has displayed a willingness and ability to

9

maintain employment when he is free.  *See id.* at ¶¶ 91–92.[4]  Unfortunately, those efforts at employment have been cut short by relapses into his heroin addiction.  *See id.* at ¶ 103 ("With the exception of a three year period between 2002 and 2005 when he was able to maintain sobriety, the defendant abused heroin nearly continuously when not incarcerated.").  And when Gonzalez has relapsed, he has turned to violent crime.  *See id.* at ¶ 95 ("Mr. Gonzalez noted that when he relapses, he typically starts off with funds saved that he uses to purchase narcotics.  Once these funds run out, he then turns to committing crime, as he does not know any other way to obtain the funds needed.").  Thus, after Gonzalez relapsed in 2005, he was in and out of custody until he committed the instant crimes in 2009.  *See id.* at ¶¶ 95–99.

Because of Gonzalez's criminal history, at the time of his sentencing in this matter, he qualified as a career offender under the Guidelines.  *See id.* at ¶ 4; Plea Agreement, Doc. No. 75, at 5.  In their plea agreement, the parties calculated Gonzalez's Guidelines range to be 211-to-248 months' imprisonment.  *See* Plea Agreement, Doc. No. 75, at 5.  However, as reported in the PSR and discussed at sentencing, that Guidelines range was incorrectly calculated:  Gonzalez's true Guidelines range was 262-to-327 months' imprisonment.  *See* PSR, Doc. No. 151, at ¶¶ 21–45, 123; *see also* Sentencing Tr. at 5:24–8:2.[5]  In sentencing Gonzalez to 220 months' imprisonment, I agreed to give effect to the parties' agreement.  *See* Sentencing Tr. at 38:4–6.

Several comments I made at sentencing are relevant to the resolution of the instant motion.  First, when I sentenced Gonzalez, I recognized the difficulties in Gonzalez's life and the promise that he had shown.  *See id.* at 32:13–21 (noting that "it's impossible not to be struck by

---

[4]  For instance, Gonzalez has worked:  (1) at the maintenance department at Sacred Heart University, (2) at a dry cleaner in Westport, (3) at a veteran's program in Bridgeport, (4) at a Salvation Army rehabilitation center in Bridgeport, (5) at the Shehan Center in Bridgeport doing youth tutoring, (6) at Isaiah House (a halfway house) in Bridgeport, and (7) as a truck driver.  *See* PSR, Doc. No. 151, at ¶¶ 91–95; ¶¶ 113–17.

[5]  Although the transcript from the sentencing hearing in this matter is not available on the case's public docket, I have reviewed a rough draft of that transcript from my court reporter.  All citations to the hearing transcript correspond to that rough draft.

the tragedy of your life" because "[y]ou strike me as somebody who's intelligent, who obviously

has had a work history," and so "I can't help but wonder what would have happened, how much

better your life and other people's lives would have been if you hadn't gotten hooked on

heroin").

Second, I focused on the seriousness of Gonzalez's crimes.  I explained that "16

robberies is, it's literally a life of crime."  *Id.* at 32:25–33:1.  And I remarked that Gonzalez's

heroin addiction was obviously relevant, but it neither fully explained nor excused Gonzalez's

acts.  I said:

> [I]t really isn't good enough to say, well, I needed drugs and so I went and robbed
> a bank.  The crime here was not a crime of opportunity.  It was not you walking
> down the street and you saw somebody being less than careful with their money
> and you grabbed it and ran.  This was planned, this was set up.
>
> The use of disguises, the use of the umbrella to protect against the cameras and the
> surveillance; [t]he understanding of the vault versus the registers; the planning that
> went into the way the crime was committed; herding all of the employees into a
> small area where they could be controlled.  All of those things took a lot of thinking
> out and I just wish you had focused that intelligence, that determination, that
> planning on going to a methadone clinic and getting a legal substitute for the heroin.
>
> There are ways for you to address your addiction without returning to crime.  I
> understand when you talk about meeting up with the same folks and talking about
> the same thing and falling back into the same habits, and I understand that.  But it
> still really isn't an excuse for what happened because we have victims who, thank
> goodness, nobody was hurt.  Thank goodness because when folks carry guns into a
> place they are going to rob, it's largely luck when somebody's not hurt or killed,
> [e]ither them or you.

*Id.* at 33:15–34:14.

Third, I explained that Gonzalez had gotten several breaks before even appearing before

me for sentencing.  For instance, Gonzalez likely could have been facing a mandatory life

sentence pursuant to the statutory three-strikes provision.  *See* 18 U.S.C. § 3559(c); Sentencing

Tr. at 35:16–19 ("You had a break in the way that you were charged, you had a break in the way

that they didn't seek [an] enhancement that would have given me no choice but to send you to jail for the rest of your life.").[6]  Further, the parties had inadvertently agreed to a Guidelines range (211-to-248 months' imprisonment) substantially below Gonzalez's actual Guidelines range (262-to-327 months' imprisonment).  *See id.* at 35:19–21 ("You got a break, frankly, in the government agreeing to a guideline range that's lower than [the] properly calculated guideline range.").  "So, from the get-go," I explained to Gonzalez, "you're already getting a break," and, although "[y]ou're going to get a long sentence [you should] recognize just how bad it could have been."  *Id.* at 35:21–24.

Fourth, I pointed out the similarity and seriousness of Gonzalez's prior criminal conduct.

I said:

> You know, you've got a really long record, there's guns involved in lots of your crimes and there comes a point where, you know, a judge saying what should I do with this person looks at that and says, wow, you know, time and time and time again, for whatever reason, drugs or stupidity or habit or whatever, this person just didn't get it and didn't – wasn't able to conform conduct to what is expected.  And so frankly that long record is something that's very difficult to overcome as well.

*Id.* at 36:8–17.

I summed up:

> [I]n your case, in light of the seriousness of the offense, in light of the fact that you've already gotten somewhat of a break, in light of the impact on folks who were simply there doing their jobs, this is going to be a long sentence.  And I hope that I've been able to explain it to you so that you understand it and can accept it .  . . .  This sentence is not as low as your counsel wants, it's not quite as high as what the government wants although it's close, and in my view it is the sentence that is sufficient but not greater than necessary to serve the purposes of sentencing.

*Id.* at 37:14–25.

---

[6] Indeed, Gonzalez's co-defendant—Francisco Deida—was subject to mandatory life imprisonment in that way.  *See* Deida PSR, Doc. No. 107, at ¶ 89.  (Deida has since been resentenced to 240 months' imprisonment.  *See* Am. Judgment, Doc. No. 138.)

B. Parties' Arguments[7]

Gonzalez argues that "extraordinary and compelling reasons" warrant his release.  First,

Gonzalez focuses on the general threat of COVID-19 in prisons.  *See* Gonzalez's Mem. of Law,

Doc. No. 144-1, at 7–10.[8]  Second, Gonzalez discusses the particular medical conditions that

make him especially vulnerable to severe illness should he contract COVID-19:  age, obesity,[9]

and "elevated blood pressure."[10]  *See id.* at 10–12.  Indeed, Gonzalez notes that "[n]umerous

courts have granted motions for compassionate release upon finding extraordinary and

compelling circumstances based on the defendant's obesity alone."  *See id.* at 11 (citing *United

States v. Anderson*, 2020 WL 2849483, at *2 (S.D.N.Y. June 2, 2020); *United States v. Dawson*,

2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020)).  Gonzalez also mentions that his status as a

Latino may make him more likely to become severely ill from COVID-19.  *See id.* at 12.[11]

---

[7] The parties agree that Gonzalez has satisfied section 3582(c)(1)(A)'s exhaustion requirement.  *See* Gonzalez's Mem. of Law, Doc. No. 144-1, at 23; Gov't Opp'n, Doc. No. 146, at 5; Administrative Remedy Denial, Doc. No. 146-1.

[8] The general threat of COVID-19 in prisons, without more, is not an "extraordinary and compelling reason" warranting an inmate's release.  *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release.").

[9] As of August 11, 2020, Gonzalez had a BMI of 31.5.  *See* Gonzalez's Medical Records, Doc. No. 143-1, at 44, 50; *see also Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (enter height of 6 feet 1 inch and weight of 238.6 pounds) (last visited Feb. 22, 2021).  Gonzalez's August 11, 2020 BOP medical record appears to be the most recent medical record available.  *See* Gonzalez's Medical Records, Doc. No. 143-1, at 44–47, 50.

[10] Gonzalez argues that, although he has not been diagnosed with hypertension, he has "elevated" blood pressure.  *See* Gonzalez's Mem. of Law, Doc. No. 144-1, at 3 (noting that Gonzalez's most recent blood pressure reading—131/94—seems to suggest that Gonzalez has stage 1 hypertension).  Gonzalez argues that because he has "a history of cardiovascular disease and heart attacks or strokes in his family," that rising blood pressure is particularly concerning.  *See id.* at 3–4.

[11] Regrettably, Gonzalez is correct in noting that both the rates of death and hospitalization from COVID-19 among Hispanic Americans is much higher than that among the general population.  *See COVID-19 Hospitalization and Death by Race/Ethnicity*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Feb. 18, 2021).  As I have remarked elsewhere, though, "so far as is currently understood, that difference most probably owes to long-standing systemic health and social inequities."  *United States v. Leigh-James*, 2020 WL 4003566, at *8 (D. Conn. July 15, 2020) (cleaned up).  Thus, the fact of Gonzalez's ethnicity itself "does not constitute a risk factor for COVID-19[] in the same way[] as, for instance, an underlying medical condition."  *Id.* (cleaned up).

Gonzalez argues, too, that the status of COVID-19 infections at his current place of incarceration—FCI Bennettsville—counsels in favor of release. *See id.* (reporting that, as of Dec. 21, 2020, FCI Bennettsville had three positive cases). Further, Gonzalez argues that the threat and presence of COVID-19 in prisons has made his time "more punitive than intended." *Id.* at 14–15. Gonzalez points out that certain other courts have taken that fact into account in reducing inmates' sentences. *See id.* (citing *Rodriguez*, 2020 WL 5810161, at *3; *United States v. Lizardi*, 2020 U.S. Dist. LEXIS 188147, at *10–12 (S.D.N.Y. Oct. 9, 2020)). Finally, Gonzalez argues that his rehabilitation helps constitute an "extraordinary and compelling reason" warranting his release. *See id.* at 15–16. More specifically, Gonzalez notes that he "has worked in the facility's laundry" and "has taken classes geared towards increasing his employability, including classes on resume writing, interviewing, and other employability skills." *Id.* For all the above reasons, Gonzalez argues that "extraordinary and compelling reasons" warrant his release.

With respect to the section 3553(a) sentencing factors, Gonzalez notes that a sentence of the time he has already served (more than 11 years) is sufficient to accomplish the purposes of sentencing. *See id.* at 16–23. Gonzalez argues that the time he has already served reflects the seriousness of his offenses because nearly 12 years in prison is "objectively punitive, made more so during the pandemic." *Id.* at 18. Most forcefully, Gonzalez argues that there is virtually no deterrent effect from keeping him in prison any longer given "his current age, accomplishments in prison, and strong release plan." *Id.* Gonzalez notes that 62-year-olds are empirically unlikely to recidivate. *See id.* (citing *United States v. Tucker*, 356 F. Supp. 2d 808, 810 (S.D. Iowa 2019)); *see also id.* at 20–22 (arguing that longer sentences do not deter more than do shorter sentences). Gonzalez plans to live with his niece in New Haven, with whom he "is building a

relationship." *Id.* at 19.  Gonzalez's niece is an accountant who "has children, but they are a bit older." *Id.*  At his niece's home, Gonzalez would have his own room in which to quarantine upon arrival. *Id.*  Gonzalez argues that his criminal activity is entirely related to his heroin use and that "[h]is addiction can be addressed through treatment and monitoring." *Id.* at 20, 23.

The government agrees that Gonzalez's age—"combined with his other health concerns"—constitutes an "extraordinary and compelling reason" warranting release. *See* Gov't Opp'n, Doc. No. 146, at 6.  Nevertheless, the government argues that I should not release Gonzalez because doing so would result in a sentence insufficient to meet the purposes of sentencing as articulated in section 3553(a). *See id.*  The government argues that Gonzalez "largely presents as the same person that the Court sentenced in 2010: a thoughtful and articulate man whose decades-long drug addiction has carried with it a decades-long criminal career consisting of a series of armed robberies." *Id.* at 6–7.  According to the government, very little has changed.  The government stresses the seriousness of this offense and Gonzalez's troubling criminal history. *See id.* at 7 ("Gonzalez has one of the most serious, longest, and persistent criminal histories among individuals in federal court.").  The government reiterates that, in 2009, Gonzalez "realistically faced a host of potential sentencing enhancements, including a mandatory life sentence under the 'Three Strikes' provision of 18 U.S.C. § 3559(c)(1)." *Id.*  Thus, "even in the face of genuine health concerns," the government argues that I should decline Gonzalez's motion for release because his "record discloses a serious recidivism risk." *Id.* (citing *United States v. Mack*, 460 F. Supp. 3d 411, 416–17 (S.D.N.Y. 2020)).  In that respect, the government notes that "Gonzalez's sparse release plan, combined with the ongoing opioid epidemic in Connecticut and the limitations of the U.S. Probation Office during the pandemic," does not inspire "confidence that Mr. Gonzalez presents no risk of reoffending upon release." *Id.* at 8.

15

The government argues that Gonzalez's rehabilitation has been impressive but that it sheds little light on the question whether "he will conform his conduct to the law if released."  *Id.*

    C.  <u>Evaluation</u>

I will not reduce Gonzalez's sentence because doing so would not comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

    a.  Extraordinary and Compelling Reasons

Although Gonzalez and the government agree that Gonzalez has established that "extraordinary and compelling reasons" warrant his release, in my view that presents a close question.  Because I hold that the Gonzalez is not entitled to a sentence reduction based on my consideration of the section 3553(a) sentencing factors, I need not resolve the question.  Still, I will explain why, in my view, it is a close question.

First, I do not intend to minimize Gonzalez's risk of contracting COVID-19 or the severity of the COVID-19 pandemic.  I acknowledge that, as a general matter, prisons and jails are among the most dangerous places to be during an epidemic.  *See United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("Jails and prisons are powder kegs for infection."); *see also Covid-19's Impact on People in Prison*, EQUAL JUSTICE INITIATIVE, https://eji.org/news/covid-19s-impact-on-people-in-prison/ (last updated Jan. 7, 2021).  And at Gonzalez's place of incarceration—FCI Bennettsville—there are now eight positive cases, which is up modestly from the time that Gonzalez submitted the instant motion.  *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Feb. 22, 2021).[12]

---

[12]  In determining whether "extraordinary and compelling reasons" warrant an inmate's release, "courts routinely take into account the status of coronavirus infections at the particular institution where the defendant is housed."  *United States v. Petersen*, 2020 WL 7129705, at *7 (D. Conn. Dec. 3, 2020).

Still, in my view, neither Gonzalez's age, obesity, nor "elevated" blood pressure weighs meaningfully in Gonzalez's favor on the facts of this case.  First, Gonzalez is obese (BMI of 31.5), but that is "only slightly over the at-risk threshold" of 30.  *United States v. Elliott*, 2020 WL 4381810, at *5 (E.D.N.Y. July 31, 2020).  Several courts have held that a defendant's slight obesity—particularly if there is no evidence that that obesity causes the defendant health problems—does not count significantly in the defendant's favor in determining whether "extraordinary and compelling reasons" warrant that defendant's release.  *See, e.g.*, *id.*; *United States v. Meyer*, 2020 WL 6287697, at *8 (E.D. Wis. Oct. 27, 2020).

Second, Gonzalez does not claim that he has been diagnosed with (or is taking medication for) hypertension.  Rather, Gonzalez claims that he has "elevated" blood pressure.  Even if Gonzalez did have hypertension,[13] that, too, would not weigh significantly in his favor.  As I have explained elsewhere, several courts have denied inmates' motions for compassionate release based on those inmates' hypertension when those inmates have failed to show that the BOP's treatment was in some way inadequate.  *See United States v. Petersen*, 2020 WL 7129705, at *8 (D. Conn. Dec. 3, 2020); *see also United States v. Ackerman*, 2020 WL 5017618, at *5 (E.D. Pa. Aug. 25, 2020) ("Where, as here, there is no indication that the defendant's hypertension cannot be properly controlled via medication or other appropriate medical care, courts routinely hold that compassionate release is not warranted."); *United States v. Thomas*, 471 F. Supp. 3d 745, 749–50 (W.D. Va. 2020) ("Hypertension, or high blood pressure, a condition that the CDC estimates impacts 43.8% of the United States adult population, alone

---

[13]  I acknowledge that those who suffer from hypertension may be at an increased risk for severe illness from COVID-19.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Feb. 22, 2021).  It is true that some other courts have released inmates based, in part, on those inmates' hypertension.  *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 422, 427–28 (N.D.N.Y. 2020).

does not constitute an 'extraordinary and compelling reason.'").  Gonzalez does not argue that his blood pressure is not being adequately treated.

Gonzalez's age (62) is perhaps the strongest reason supporting his release.  According to the CDC, people between 50 and 64 years old are 25 times more likely to be hospitalized and 400 times more likely to die from COVID-19 than people between 5 and 17 years old.  *See COVID-19 Hospitalization and Death by Age*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated Feb. 18, 2021).  Still, the difference in hospitalization and death rates becomes much starker for people older than Gonzalez.  For instance, people between 65 and 74 years old are 35 times more likely to be hospitalized and 1100 times more likely to die from COVID-19 than people between 5 and 17 years old.  *See id.*  People between 75 and 84 years old are 55 times more likely to be hospitalized and 2800 times more likely to die from COVID-19 than people between 5 and 17 years old.  *See id.*  And people over 85 are 80 times more likely to be hospitalized and 7900 times more likely to die from COVID-19 than people between 5 and 17 years old.  *See id.*  That is, a 62-year-old individual is not close to the most at-risk age group with respect to COVID-19 hospitalizations and deaths.  I would view Gonzalez's argument much differently were he 10 or 15 years older than he is.  In part for that reason, I agree with other courts that have held, in similar circumstances, that the age of a relatively healthy defendant in his early sixties might not help constitute an "extraordinary and compelling reason" warranting his release.  *See, e.g.*, *Haney*, 454 F. Supp. 3d at 322–323.

For those reasons, I am unsure whether I agree with the parties that "extraordinary and compelling reasons" warrant Gonzalez's release (or a reduction in his sentence).  However, as described above, I need not resolve that question.

      b.   Section 3553(a) Factors

Even if I were to hold that Gonzalez had shown "extraordinary and compelling reasons"

warranting his release, I would not reduce Gonzalez's sentence because doing so would not

result in a sentence sufficient to achieve the purposes of sentencing.  Pursuant to section 3553(a),

I must impose a sentence that is sufficient, but not greater than necessary, to (1) reflect the

seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford

adequate deterrence, (3) protect the public from further crimes of the defendant, and (4) provide

the defendant with training, medical care, and other treatment in the most effective manner.  18

U.S.C. § 3553(a)(2).  I must also consider "the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct."  *Id.* §

3553(a)(6).  I must also examine other factors, including the nature and circumstances of the

offense and the history and characteristics of the defendant.  *See id.* § 3553(a)(1).

In my view, reducing Gonzalez's sentence would result in a sentence insufficient to

reflect the seriousness of these crimes.  As I noted at the sentencing hearing in this matter, the

most important considerations animating my sentence were (1) the seriousness of the offense and

(2) "the fact that you've already gotten somewhat of a break."  Sentencing Tr. at 37:14–25.

Regarding (1), Gonzalez carried out two premeditated, armed bank robberies, which included the

use of disguises, umbrellas, and getaway cars.  I reiterate:  It is merely lucky that no one died as

a result of those armed bank robberies.  And although I acknowledge that Gonzalez's criminality

is apparently linked to his drug addiction, that linkage simply does not fully explain these crimes,

nor does it excuse them.  *See id.* at 33:15–34:14 ("There are ways for you to address your

addiction without returning to crime.").  Regarding (2), I have already explained that Gonzalez

benefitted tremendously from the government's charging decisions and the parties' erroneous

Guidelines calculations in this case.  It is possible that Gonzalez could be serving a mandatory

life sentence for these crimes.  Thus, even though Gonzalez is currently serving a 220-month

sentence, that sentence represents, in many ways, a very lenient sentence given Gonzalez's

conduct in this case and criminal history.

Gonzalez emphasizes his low risk of recidivism based on his age and release plan.  I

agree that as an offender ages, the likelihood that he recidivates decreases.  *See Recidivism*

*Among Federal Offenders: A Comprehensive Overview*, UNITED STATES SENTENCING COMM'N

23 (March 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2016/recidivism_overview.pdf (graphing rearrest rates based

on offenders' age both at sentencing and release).  But that fact cuts both ways for Gonzalez.

Although Gonzalez is now 62, he committed the instant crimes when he was 51.  By then, he

might have been expected to have "aged out" of his criminal activity, but he had not.  Further,

Gonzalez does not have strong roots in the community[14] and has repeatedly emphasized that the

structured environment of prison helps him function.  Each time that Gonzalez has been released

in the past, he has, sadly, returned to the life most familiar to him.

Gonzalez's conduct in prison cuts in his favor:  He has made substantial efforts at

rehabilitation.  Gonzalez has stayed out of trouble and has taken numerous courses, particularly

focusing on employability.  *See* BOP Records, Doc. No. 146-2, at 1–2.  However, although

Gonzalez has apparently undertaken certain drug-related education and treatment, *see id.* at 3, he

does not discuss it in his motion.  That is curious because it is Gonzalez's addiction that will

potentially stand in the way of his successful reintegration into society.  Gonzalez has already

---

[14]  I agree with the government that Gonzalez's release plan does not necessarily inspire confidence.  That is because Gonzalez admits that he does not know his niece well.  *See* Gonzalez's Mem. of Law, Doc. No. 144-1, at 19 ("Gonzalez is building a relationship with his niece.").

proven that he is employable.  *See* PSR, Doc. No. 151, at ¶¶ 113–17 (employment history);
Sentencing Tr. at 32:13–21 ("[I]t's impossible not to be struck by the tragedy of your life"
because "[y]ou strike me as somebody who's intelligent, who obviously has had a work
history").  I encourage Gonzalez to use the remainder of his time in prison to focus on his
addiction and his plan for staying clean once he is released.  In sum, Gonzalez's rehabilitation is
encouraging, but it is not enough, in my view, to warrant a lower sentence.

Finally, I recently re-sentenced Francisco Deida for his role in the two bank robberies at
issue in this case.  *See* Min. Entry, Doc. No. 137.  I sentenced Deida—who is just a few years
younger than Gonzalez—to 240 months' imprisonment.  *See* Am. Judgment, Doc. No. 138.  In
general, I agree with the government that Deida may have a slightly more serious criminal
history than Gonzalez but that the two co-defendants "were equally culpable in the two bank
robberies."  Gov't Opp'n, Doc. No. 146, at 9 n.4.  Reducing Gonzalez's sentence further might
result in an "unwarranted sentencing disparit[y]" between Gonzalez and Deida, who are
defendants with "similar records who have been found guilty of similar conduct."  18 U.S.C. §
3553(a)(6).

### III.    Conclusion

For the foregoing reasons, Gonzalez's motion for release or a reduction in sentence, doc.
no. 144, is **denied**.


IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 22d day of February 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
